[Cite as *State v. Buell*, 2016-Ohio-5477.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2015-11-102 |
| | : | O P I N I O N |
| - vs - | | 8/22/2016 |
| | : | |
| LISA BUELL, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 15CR30695


David P. Fornshell, Warren County Prosecuting Attorney, Kathryn Horvath, 520 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Engel & Martin, LLC, Mary K. Martin, 5181 Natorp Blvd., Suite 210, Mason, Ohio 45040, for defendant-appellant


**PIPER, P.J.**

{¶ 1} Defendant-appellant, Lisa Buell, appeals her conviction in the Warren County Court of Common Pleas for patient abuse.

{¶ 2} Buell was employed with Residential Group Homes, Inc. as a direct care provider for patients with varying disabilities. Buell worked in a specific house where three residents lived, and was working her morning shift when another employee observed her

strike a patient three times on the back with an open palm. The other employee observed Buell's actions through the front window of the home in which the three residents lived. The employee, who was approaching the house in order to help transport the residents for the day, reported what he saw to his supervisors once he had successfully transported the residents. The employee also informed police of his observations, and Buell was later charged with assault and patient abuse.

{¶ 3} The matter proceeded to trial, where the state presented testimony from the employee who observed Buell hit the patient, as well as other employees who noticed marks on the victim and observed the victim uncharacteristically sad and angry on the day of the incident. After the state rested, the trial court dismissed the assault charge, but allowed the patient abuse charge to proceed.

{¶ 4} Buell testified on her own behalf and denied striking the victim. Buell also called witnesses who testified that the window to the home where the residents lived was obstructed by a Christmas tree, curtains, and fake snow. Another witness also testified that she was in the vicinity of Buell at the time of the alleged incident and that Buell never hit the patient.

{¶ 5} The jury found Buell guilty of patient abuse. The trial court sentenced Buell to 18 months in prison, which was suspended in its entirety, three years of community control, 60 days of house arrest, as well as fines and costs. Buell now appeals her conviction and sentence, raising the following assignments of error. For ease of discussion, we will address the assignments of error out of order, and will combine some assignments of error where interrelated.

{¶ 6} Assignment of Error No. 4:

{¶ 7} THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 8} Assignment of Error No. 5:

{¶ 9} THE JURY'S VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 10} Buell argues in her fourth and fifth assignments of error that her conviction was not supported by sufficient evidence and was rendered against the manifest weight of the evidence.

{¶ 11} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 12} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 13} "While appellate review includes the responsibility to consider the credibility

of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide." *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 14} Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 15} Buell was convicted of patient abuse in violation of R.C. 2903.34(A)(1), which provides, "No person who owns, operates, or administers, or who is an agent or employee of, a care facility shall * * * [c]ommit abuse against a resident or patient of the facility." After reviewing the record, we find that Buell's conviction was supported by sufficient evidence and was not rendered against the manifest weight of the evidence.

{¶ 16} The state presented testimony from the employee who witnessed Buell hit the patient. He testified that his duties include helping the patients with daily activities, including taking them to and from work or other activities. On the day in question, the employee was walking toward the house in which the victim resided. His job that morning was to transport some of the patients to another facility where they would spend the day. As he approached the house and looked through the large front window he observed Buell strike the victim three times with an open palm.

{¶ 17} The employee testified that at the time he observed the incident, there was nothing blocking his view, and that there were no blinds or curtains drawn to obstruct his view into the home. The state asked the employee whether there was a Christmas tree

blocking the view, and he testified that the tree was on the left side of the window, which did not block his view. He also testified that the inside lights were on, making it easier to see inside.

{¶ 18} The employee later testified that he observed the victim crying "big tears," and also described the victim "wailing." The victim cried during the entire drive to the facility, and the employee stated that the victim was still crying when he dropped her off. The employee further testified that he had never seen the victim cry in that manner before the day of the incident, and has not seen the victim cry like that since.

{¶ 19} The staff director and coordinator of patient events at Residential Group Homes testified that the victim, who was 52 at the time of the incident, has Down's Syndrome. The director testified that the victim is approximately four-feet-tall and weighed 75-85 pounds. At the time of the incident, the victim had difficulty walking, and was "nonverbal." The director testified that the victim behaves as a 18-month to two-year-old child would in regard to understanding and articulating verbally.

{¶ 20} The director testified that when the victim arrived at the facility on the day in question, she was "very upset," "teary-eyed," and had "outbursts" and "whales" [sic]. The director testified that she had never seen the victim act in that manner, that the victim's behavior was "unusual," and that she has not seen the victim act in a similar manner since the day of the incident.

{¶ 21} The director testified that she took photos of the victim after being informed of Buell's actions. On the first day, the victim did not exhibit any marks or bruises. However, on the second day, or the day after the incident, the director observed a "red mark that kind of fingers out a little bit" on the victim's back.

{¶ 22} The state also presented the testimony of an employee who had known the victim for 14 years and who worked in the facility the victim was transported to after the

incident. The employee testified that the victim was low functioning in terms of her Down's Syndrome, and is very limited in communication. On the day of the incident, the employee observed the victim "crying a lot," and that the victim "seemed really angry." The employee testified that she remembered the victim "crying extensively" and that such behavior was not typical behavior. The employee more specifically testified that while the victim is normally "quiet and happy," on the day of the incident, the victim "kept crying and getting mad and knocking things over and stuff." Similar to prior witnesses, the employee testified that she had never seen the victim act like that before the day of the incident, nor since. The employee, who had also examined the victim for any bruises, testified that that she observed marks on the victim's back on the day after the incident.

{¶ 23} The state next presented testimony from the detective who investigated Buell's actions. The detective testified that he interviewed the employee on the day that the incident occurred, and that he had no reason to doubt the employee's recollection of events. The detective also testified that the photographs taken of the victim's back the day after the incident corroborated the employee's observations because the red marks were located in the same place where the employee stated the strikes occurred.

{¶ 24} The detective also testified that he went to the house where the victim lived to view the window through which the employee observed Buell striking the victim. The detective stated that he was able to look into the window and was able to see inside, and that he had no issues looking "right in." The detective also testified that when he looked in, he could see inside clearly.

{¶ 25} The detective also testified that he interviewed another employee who was with Buell on the day of the incident, who claimed that at no time did she see Buell hit the victim. The detective testified that during his interview with the employee, she was "minimizing" several aspects of the incident, including that she and Buell were yelling at the

patients, and the way that Buell handled the victim when trying to get her to walk outside. The detective indicated that he believed the employee who observed the incident, and that conversely, he did not believe the other employee who stated that Buell never hit the victim while in her presence. The detective also confirmed that the photographs taken of the victim support the claim that Buell struck the victim in the back.

{¶ 26} In her own defense, Buell testified that she did not strike the victim. Buell also offered witnesses who testified that the view from the window was blocked by a Christmas tree and fake snow, and that someone looking inside the window would not have been able to see inside clearly. Another witness also testified that she was with Buell the morning on the day of the incident, and that Buell never hit the victim.

{¶ 27} Despite the testimony in favor of Buell, the jury was in the best position to determine the credibility of the witnesses, and we will not disturb its determination that the state's witnesses were more credible. "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound principle that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence." *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41.

{¶ 28} After reviewing the evidence that Buell hit the victim three times in the back in a light most favorable to the prosecution, we find that any rational trier of fact could have found the elements of patient abuse proven beyond a reasonable doubt. Moreover, after reviewing the entire record, we find that the jury did not lose its way or create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. As such, Buell's conviction is supported by sufficient evidence and was not rendered against the manifest weight of the evidence. Buell's fourth and fifth assignments of error are therefore, overruled.

{¶ 29} Assignment of Error No. 1:

{¶ 30} THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING PHOTOGRAPHS OF THE ALLEGED CRIME SCENE WITHOUT PROPER AUTHENTICATION.

{¶ 31} Buell argues in her first assignment of error that the trial court committed plain error by admitting certain photographs at trial because such were not authenticated.

{¶ 32} An appellate court will not reverse a trial court's decision regarding the admission of evidence absent an abuse of discretion. *State v. Lamb,* 12th Dist. Butler Nos. CA2002-07-171 and CA2002-08-192, 2003-Ohio-3870, ¶ 59. However, when a party fails to object to the issue now appealed, we review for plain error. *State v. Dougherty*, 12th Dist. Preble No. CA2013-12-014, 2014-Ohio-4760, ¶ 53. Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceeding. *State v. Sheldon*, 12th Dist. Brown No. CA2013-12-018, 2014-Ohio-5488, ¶ 30. Under a plain error analysis, a reviewing court will not reverse a conviction based on a trial court's instruction "unless, but for the error, the outcome of the trial clearly would have been otherwise." *Dougherty* at ¶ 53.

{¶ 33} "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 65. The "threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *Id.* "Instead, the state only needs to demonstrate a reasonable likelihood that the evidence is authentic." *State v. Scott*, 12th Dist. Warren No. CA2012-06-052, 2013-Ohio-2866, ¶ 35.

{¶ 34} Photographic evidence can be authenticated by a person with knowledge to state that the photograph represents a fair and accurate depiction of the item, person, or

place at the time the picture was taken. *Id.* In authenticating evidence through this method, there is no need to call the witness who took the photographs as long as a witness with knowledge can testify that the photograph is a fair and accurate depiction. *Id.*

{¶ 35} After reviewing the record, we find that the photographs were properly authenticated. The state presented the first photo during the testimony of the employee who witnessed the incident. The state gave the witness the picture of the window and house, and asked whether it was "a fair and accurate picture of the house* * *," to which the witness responded, "It's an accurate picture, yes. It's the house." While Buell argues that the witness did not address whether the photograph was "fair" in his response, we find that there is no plain error given that the witness was clearly indicating an affirmative answer to the state's question as to whether the photograph was a fair and accurate depiction. Moreover, the state again authenticated the photograph with the detective who actually took the picture. When the state asked whether the photograph "fairly and accurately depicts the way [the house] looks," the detective answered, "Yes."

{¶ 36} For the second photo, which was also a view of the house and window from the outside, the state asked the employee who observed the incident whether the photograph was a "fair and accurate photo of how the house was set up * * *." The employee responded, "ah-huh." The state again asked, "that is fair and accurate?" and the employee responded, "yes."

{¶ 37} In regard to the third and fourth photographs, the record indicates that the photographs were taken by the defense and given to the state during discovery. The photographs showed what the window looked like with the shades/blinds shut. The state addressed the photographs with the employee who observed the incident, and asked whether the photographs were accurate. While the witness testified that the photograph was of the window in question, the witness responded that the photographs were not

accurate in the sense that the shades were not drawn on the day in question. The witness further described the picture of the obstructed window as "deceitful" because the window was not so obstructed on the day in question.

{¶ 38} While Buell now argues that this testimony demonstrates plain error because no witness testified that the picture was a fair and accurate depiction, the record indicates that the photographs were taken by the defense—not the state, and did not cause any prejudice to Buell given that the jury had an opportunity to view what the window would have looked like with blinds shut. As such, the results of the trial would not have been different had the third and fourth photographs not been admitted.

{¶ 39} After reviewing the record, we find that the photographs taken by the state's witness and entered into evidence were properly authenticated. Although no witness testified that the third and fourth photographs were a fair and accurate depiction of the house and window, no plain error exists because Buell has failed to show she was prejudiced as a result of the trial court admitting photographs that she, herself, took and included as discovery. As such, the trial court did not commit error, plain or otherwise, in admitting the photographs as evidence. Buell's first assignment of error is therefore, overruled.

{¶ 40} Assignment of Error No. 2:

{¶ 41} THE COURT COMMITTED PLAIN ERROR BY ALLOWING EXPERT MEDICAL TESTIMONY FROM A NON-EXPERT WITNESS.

{¶ 42} Buell argues in her second assignment of error that the trial court erred in allowing the witnesses to testify about medical issues without being medical experts.

{¶ 43} Pursuant to Evid.R. 701, a lay witness may testify in the form of opinions or inferences as long as the opinions or inferences are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the

determination of a fact in issue." If the lay witness' opinion is not rationally based on his or her perception, then the opinion is speculation, and as such, cannot be helpful to a determination of a fact in issue. *State v. Feerer*, 12th Dist. Warren No. CA2008-05-064, 2008-Ohio-6766, ¶ 23.

{¶ 44} Evid.R. 701 grants the trial court wide latitude in allowing or controlling lay witness opinion testimony. *State v. Cornish*, 12th Dist. Butler No. CA2014-02-054, 2014-Ohio-4279, ¶ 25. Normally, an appellate court reviews a trial court's decision regarding lay witness testimony for an abuse of discretion and the party challenging the testimony must demonstrate that, if the trial court abused its discretion, such abuse "materially prejudiced the objecting party." *Id.* at ¶ 25. However, Buell did not object to the testimony at trial, and as such, we will employ a plain error standard of review.

{¶ 45} Buell argues that plain error occurred when the state's witnesses testified that they did not observe any bruises or marks on the victim on the day of the incident, but checked the day after the incident because bruises or marks can exhibit themselves the next day. Buell argues that this testimony and conclusion are not within the knowledge a layperson would have. We disagree.

{¶ 46} The record is clear that both witnesses who testified to checking the victim the day after the incident were knowledgeable of the circumstances surrounding checking patients for marks or bruises, as they had done such before as part of their normal employment. More specifically, the first witness testified that she had, in her own experience, seen injuries appear on the "second or third day" after an incident occurred. Similarly, the second witness who testified to checking for injuries on subsequent days testified that doing so was common practice because such marks may not be observable until the next day.

{¶ 47} The witnesses' testimony did not require any specialized medical knowledge,

- 11 -

and was instead, within the normal purview of a lay witness who has experience in working with patients and checking for injuries. As such, we find the witnesses' testimony that they checked for injuries on the second day and found marks was rationally based on their perception and was helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue that the victim had marks on her back in the area where the witness saw Buell strike the victim. Having found no error, plain or otherwise, Buell's second assignment of error is overruled.

{¶ 48} Assignment of Error No. 3:

{¶ 49} THE TRIAL COURT ABUSED IT'S [SIC] DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR JURY VIEW.

{¶ 50} Buell argues in her third assignment of error that the trial court erred when it denied her motion for the jury to view the scene where the crime occurred.

{¶ 51} According to R.C. 2945.16, "When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court." The decision whether to permit a jury view is within the discretion of the trial court, and is not subject to reversal on appeal absent a demonstration that the decision was an abuse of discretion. *State v. Humfleet*, 12th Dist. Clermont Nos. CA84-04-031 and CA84-05-036, 1985 WL 7728, *5 (Sept. 9, 1985); *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 34 (2002). An abuse of discretion is more than an error of law or judgment, and instead implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Thompson*, 12th Dist. Warren No. CA2015-09-083, 2016-Ohio-2895, ¶ 8.

{¶ 52} The record indicates that Buell asked the trial court to permit a jury view of the house in which the victim resided, and that the trial court denied the request. We find

no abuse of discretion in this decision. The jury was presented with photographic evidence of the window, as well as the front of the home where the window was located. The state also presented a photograph of a different angle of the view directly into the home. From this evidence, the jury was in a position to determine the credibility of the employee's testimony that he looked into the window and observed Buell's actions on the day in question. As such, the photographic evidence allowed the jury to see the home and window without actually going to the house.

{¶ 53} While Buell argues that a view of the home was "vital" to the case because the photographs did not depict the house at the time of the incident, we note that a jury view would not have allowed the jury to go back in time and observe the window and house as it was on the day in question. The trial occurred in September, and the house was not decorated for Christmas. As such, the jury would not have been able to determine anything differently about the position of the Christmas tree or alleged fake snow than it did through the conflicting testimony of the employees.

{¶ 54} After reviewing the record, we find that the trial court did not abuse its discretion in denying the jury view. Buell's third assignment of error is therefore, overruled.

{¶ 55} Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.